Now you may proceed when you are ready. May it please the court. Good morning. Justice Jorgensen, Justice Hutchinson, and Justice Burke. My name is Jeff Swatzeler. I represent the appellant Gallagher-Bassett Services. Gallagher-Bassett's allegations in his second medical complaint were more than sufficient to allege all the claims against the police, and the evidence that was offered by defendants was not admissible and should never have been considered in dismissing any of those         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. In his second medical complaint on tournament issues, the trial court aired when it granted that police motion to dismiss, and this morning we ask that you reverse that decision. I think it's important to frame the discussion, to briefly go over some of the important facts that led to the lawsuit being filed on the forum of basis of some Gallagher-Bassett's allegations. And it's also critical that your honors remember that in some respects, you were wearing your trial court judge hats this morning, this is a denial of review of a motion to dismiss that was granted. So the trial court's decision is not entitled to any deference, and you look at the facts in a light most favorable to Gallagher-Bassett, and interpret those facts in their favor, construing allegations in their favor as well. So in October of 2010, Gallagher-Bassett acquired one of its competitors in the third-party administration business, a company called GAB Robbins. And when it acquired GAB Robbins, it also hired a handful of GAB Robbins' employees. And two of those employees were Mr. Acala and Ms. Palanchich, the defendants in this case. Now, when it acquired GAB Robbins and took on these employees, it hired them as new Gallagher-Bassett employees. And in exchange for that agreement to hire and continue to employ these new Gallagher-Bassett employees, they asked that they sign identical employment agreements that contain certain reasonable restrictive covenants. And how, I mean, that happened reasonably quick, but they never stopped working. I mean, they were working for, what is it, GAB one day and they were working for Gallagher-Bassett the next day. And how long before the agreement was posted on the Internet after that? I believe it was a matter of two or three weeks, Justice Hutchinson. I'm not exactly sure whether there was a stop of a day or two when they were not employed by GAB and then became employed by Gallagher-Bassett, but I believe that October 1st or right around there was the closing date of the transaction and the agreements were executed the third week of October. But were they working for Gallagher-Bassett before they actually saw the agreement? For a period of time, they were working as Gallagher-Bassett employees before they had executed that agreement. That is correct. So there is no question here, though, that the agreement was executed. And that gets us to the first count that was dismissed, the breach of contract claim. Defendants moved to dismiss under 2619, arguing that there was affirmative matter that defeated the claim as a matter of law. And the affirmative matter that they offered were their declarations that, and I'm summarizing here, essentially said that we never agreed to the restrictive covenants. There are two reasons why that argument fails and why it should have been rejected by the trial court. The first is the plain language of the agreement itself. It contained a merger clause that clearly states right above the execution line, and I'm quoting from the agreement here, that by submitting their acknowledgment, they are reading and understanding every provision of the agreement, they are executing the agreement voluntarily with full knowledge of its significance, and they intended to be fully bound by the agreement. Well, even though they were told in different ways that it really wasn't going to apply to them. Well, their argument is that they were told that, but they were told that before they then saw this language and executed the agreement. And that's, again, where the problem lies here, is that knowing and reading the language of this agreement, they executed it. So they want to bring in these factual issues at the motion to dismiss stage to dispute that. It's not the time or place for that, especially when you have the language of the merger clause in the agreement, as well as the parole evidence rule. The parole evidence rule exists to prevent arguments exactly like this, where you have unambiguous language in an agreement that has a merger clause, which states all the obligations and duties that the employee has when he or she acknowledges it. Defendants want to take the position that, despite that language, and despite never arguing that the language of the agreement is unambiguous, we should look to these prior negotiations and discussions and use that to color how the agreement is interpreted. Well, whether you have a valid agreement would be subject to parole evidence, though, would it not? It would, Justice Byrd. So if we have a restrictive covenant that's executed without consideration, then we could have some parole evidence on what the consideration was, because if there was no consideration, it would not be valid, correct? I agree that if there was no consideration, it would not be valid. There was consideration here. There were two forms of consideration, and I'm happy to discuss those, but I, again, would like to reiterate that whether or not the facts involved in the consideration or how that was interpreted, those are questions that should go way beyond the pleadings. That's something, if you're talking about an evidentiary hearing, that we should have at this stage. Well, whether there's consideration in the form of that, whether there's consideration is generally a question of law, is it not? I agree with that, but here, where there are factual underpinnings to that question, for example, they want to argue that the period of time was insufficient to satisfy what courts have considered to be sufficient consideration, those are questions of fact, and when you look at the allegations of our complaint, when you read the language of the agreement and, again, interpret those in the light most favorable to Gallagher-Bassett, those should have survived the motion to dismiss it. Well, they're not questions of fact. I mean, they're facts that are unquestionable, and we know that somebody started on a certain date, signed the agreement on a certain date, and resigned on a certain date, so I mean, the length of employment, of time of employment, is not a question of fact. It's a fact that is really uncontested, is it not? I agree with that, but I think if you want to focus on the continued employment aspect, I think it's, in some ways, slightly incorrect to look at this as a pure continued employment case. This is not the situation that you see in some cases where an employee has been working for a company for five or six years, their employer presents them with an employment agreement, it contains restrictive covenants, and they then ask them to execute it. And consideration for that would be their continued employment going forward. Here, we really have a case where these were new Gallagher-Bassett employees. Yes, there might have been a two or three week lag between the period of time in which they started working for Gallagher-Bassett and when they executed the agreements, but if you look at the length of the agreement, and you look at how that transaction occurred, they were new Gallagher-Bassett employees. So in a sense, when they executed the agreement, their employment was given in consideration for their agreement to comply with those restrictive covenants. And I also think that, given that slightly gray area between whether or not it's continued employment or new employment from the outset, it's important to look at what the first district said in the Woodfield case about using a bright line rule when it comes to the substantial nature of continued employment. Now, I think everyone here would agree that continued employment can be consideration for restrictive covenant, but as your honors are aware, and as is spelled out in the briefs, there is some case law that suggests that continued employment must reach a certain point in time before it can be considered sufficient or adequate. Now, this court today has not set forth any adoption of that bright line standard. Some other appellate courts in the state have, but I think that the approach the court took in Woodfield and reiterated last year by the northern district, by the federal court here in Chicago, that you need to look more at the length of time is appropriate, and that's what the court should do here with respect to consideration. Is there something in this record that indicates, or in the agreement, that your failure to acknowledge this agreement with the last four digits of your social security number, showing your acceptance, means you're no longer a Gallagher-Massad employee? The language of the agreement, Justice, simply reads that you are being hired, and in exchange for your hiring, you are being given access to this confidential information that you are agreeing to the terms. So nothing as specific as that, Justice Hutchinson. But, so they wouldn't be fired if they didn't sign it, according to the written word? According to the language of the agreement, it doesn't say that, but as we spelled out in our brief, if they had not executed the agreement, they would not have been able to continue working for Gallagher-Massad. That was part and parcel of their employment. But they've had access to these records from GAB for however long they worked there, and now that they're Gallagher-Massads, they've had knowledge of them for another two to three weeks before this occurs. I think it's important to recognize that the purchase by Gallagher-Massad of GAB changes the landscape. Those are assets that Gallagher-Massad purchased. They're now Gallagher-Massad's assets. It's Gallagher-Massad's confidential information. It's Gallagher-Massad's customer contact information. It's Gallagher-Massad's information that their employees are using to service Gallagher-Massad's customers. So when Gallagher-Massad acquires all that, it then brings on these new employees and asks them to sign this agreement in exchange for their grant of employment. They're agreeing to some of these restrictive covenants. Your argument seems to me that in exchange for your giving them employment on that date, they're going to agree to this covenant. And the case law seems to be different than that because if you had these people sign this document and then fired them the next day and then they went out and tried to get another job and they were using whatever that they may have learned in that one day, that premise would be totally illusory, would it not? I agree with you, Justice Berk. I'm glad you brought that up. The distinction is here, we didn't fire these folks. And if you look at the case law that has developed into the courts that have adopted the more bright-line approach that say a certain period of months must be in place before consideration is considered adequate, that body of case law developed in response to exactly your points. They wanted to avoid situations where employers could present an employee with an agreement, get them to agree to these restrictive covenants, and then terminate them. But that's not what happened here. And that's why the first district in Woodfield and later the district court in the LKQ group case looked at that and said we need to consider these other factors. If we are in a situation where the employee is the one who leaves, then this bright-line rule might not apply. So we need to consider all that. And I think it's important, especially now after Reliable, both this Court's decision and the Supreme Court's decision reiterated that in a restrictive covenant context in general, the idea of reasonableness has become even more important. And it's important to look at all these aspects of these types of agreements in determining whether or not they're going to be enforceable. And I will just remind the Court that this Court's decision in Reliable, when it was discussing restrictive covenant law in general, reiterated the position that the adequacy of consideration is not something that generally should be delved into. It's generally understood that as long as there is consideration for restrictive covenant and the covenant's reasonable, it's enforceable. And that's where we are here. But again, all this discussion, I think... That's a way. That's a way. Again, I understand what Reliable said. I mean, that's a weighing of consideration. We're not to weigh the consideration against the burden it places on the person. But the issue of whether there is consideration is the first issue. If we have consideration, then we're not to weigh it against the burden. But if there is not consideration, we never get to that, what Reliable talked about. Correct? I agree, Justice Berkley. There is consideration here, not only in the form of employment, but also in the form of access to Gallagher-Vass's confidential information, the information that we just spoke about. It's spelled out in their agreements that Gallagher-Vasset was providing them with the information that Gallagher-Vasset had just acquired and paid good money for that allowed them to do their jobs. Now, without that access to information, without being able to use that information, they wouldn't have been able to perform their jobs for Gallagher-Vasset. And while there might not be any direct Illinois case law on point to suggest that the access to confidential information can serve as consideration, the law is clear that consideration can take the form of any benefit. And other states recognizing that have recognized that access to confidential information can serve as consideration. And so that is an additional amount of consideration on top of the continued and or employment that Gallagher-Vasset granted these individuals when they came on board. And how are you going to draw the line between what they had at GAB and what they had at Gallagher-Vasset? I mean, they had a lot of this information already, didn't they? Although you bought it, they still had it. Does this document cleanse their mind of everything they've ever learned? It does not cleanse their mind, nor do I think it could. But I think it's above and beyond what they may have retained in their mind. Performing their job on a day-to-day basis, they needed to use the databases that Gallagher-Vasset, for example, put into place for them to access and organize and use this information. They needed access to the histories and the preferences of their clients so they could better serve those clients' needs. And that's the information, again, that Gallagher-Vasset acquired and that Gallagher-Vasset agreed to allow them to have access to, but only if they signed this employment agreement. That's spelled out explicitly. I think the point is, though, didn't they have access to that all along? They had access to it when they were employed by GAB Robbins. But when Gallagher comes in and purchases GAB Robbins and then looks at these employees and says, we are willing to hire you, but we're only willing to hire you if you execute this agreement. And unless you execute this agreement, we're not going to keep you on as Gallagher-Vasset employees and we're not going to allow you to access and use this information. So while there may be a modicum of that information in their heads, they may be able to remember people's phone numbers or the most recent deals they've done for certain clients, they're not going to be able to perform their jobs without that access to the database of information that Gallagher-Vasset acquired from GAB Robbins. Were they paid a salary before they actually signed, acknowledged these agreements? I do not know the answer to that question, Justice. Because they were working in Gallagher-Vasset offices with all of this important information before this arrived, were they? Again, I believe there was a period of time where they were working as Gallagher-Vasset employees. It wasn't a day. It wasn't two days. It was more than that, wasn't it? I believe it was two or three weeks. But again, if they hadn't, if when it got to that point in time and they were presented the agreement, if they had determined that they didn't want to sign the agreement, they would not have been able to continue accessing that information. They wouldn't have been able to continue working for Gallagher-Vasset. That's not said there. That's what we know. Even though Ms. Polanyi, if I'm saying the wrong name, I apologize, is told that this is just for salesmen. That's correct. And if I could briefly address that point, if you do look at that evidence that they offer, although we think the parole evidence rule prevents you from doing so or the trial court from doing so, when you actually look at the emails, it's very clear that Mr. Bacala sought what he called a modification to the agreement only if he was terminated by Gallagher-Vasset. If you look at the record at pages 265 and 268, he spells it out, both before he executed the agreement and afterwards, that he was negotiating a carve-out provision that would have allowed him to, if he were terminated, I think the language used is if I am terminated or if the change is by Gallagher-Vasset, that certain provisions wouldn't apply to him. That didn't happen. He was not terminated by Gallagher-Vasset. He voluntarily resigned. For that reason, the employment contract should be enforced against him, especially at this early stage in the litigation. And that's one of those factors that you talk about that Woodfield talked about. Absolutely. The trial court found no consideration and no meeting of the minds. If we were to affirm that, I mean, that pretty much took care of counts one, two, four, part of five. I'm not sure what part of five you're, there's a tortuous. Part of five is a tortious interference with the prospective economic advantage and part of the allegations in the complaint related to the improper actions being the violation of restrictive covenants. So part of that would be outlawed. I would agree with you that part of that claim would be out the door, but I don't think all of it. And obviously the trade secrets claim, if the court determined the contracts were enforceable, the trade secrets claim survives and the tortious interference with business expectancy survives. Our allegations there are more than sufficient to show that what happened here after they left, literally within a very short period of time, one client is completely out the door, one client is halfway out the door. And that was all as a result of them, the defendants leaving, using information that was ours, trading on that information to their in works benefit. On count three, are you arguing both an actual misappropriation and use, which I know the other side argues you didn't plead properly, which led to the or didn't plead adequately, I should say. And also inevitable disclosure. It seems to me that there are some paragraphs in the complaint that smack of inevitable disclosure. Were you pleading it or aren't you? I guess I didn't really come out and jump out at me as to whether or not it was being pled or not. We are not pleading inevitable disclosure, but what we are pleading, what isn't joinable is threatened misappropriation along with actual misappropriation. I think there's a difference between threatened misappropriation and inevitable disclosure. If you look at how the inevitable disclosure case law is developed, that really is a vehicle that a court can use to enjoin potential misappropriation activity, let's speak. Different from that, the censored case, for example, out of this court says that both actual and threatened misappropriation can be enjoined. So not only are we seeking damages here, we're also seeking injunctive relief. And that injunctive relief can be based on both actual misappropriation, which I believe we have alleged, as well as threatened misappropriation. Any other questions? No, not right now. Thank you. Thank you, Justice. Good morning. May it please the court. My name is Peter Steinmeier, and I represent the defendants in this case, Mike Ficala, Lisa Polansich, and York Risk Management Services. The restrictive covenant agreements at issue in this lawsuit are the foundation for each and every count of this lawsuit. Justice Burke, your question was dead on, and I'll get to it in a minute why, and I'll explain why. If the restrictive covenants are thrown out, that by itself necessitates all five counts fall. You mean for count three? Yes. The three secrets claim? Yes. Well, I'll let you get to it then. Yes. All five counts will fall. It's a threshold matter, starting with the restrictive covenants. You can't induce someone to sign an agreement by telling them that if they sign it, it won't be applied to them and that you can go ahead and sign it. That's exactly what they did here. Mr. Ficala raised questions. Ms. Polansich raised questions. They were directed to go to managerial level people at Gallagher, which is exactly what Mr. Ficala did. He was told verbally, and it's not indisputable he was told verbally. He submitted a declaration. Gallagher didn't contest it. Those facts are now uncontested. He then received an email the day before he signed, this is page 265 of the supplemental record, saying, confirming our confidential discussion of today, you may feel comfortable in signing the agreement as presented to you in the onboarding process. You will not be bound by the restrictive language of the non-compete. The very next day he signs, then they turn around and sue him. It's outrageous. Whether it's due to a lack of meeting of the minds or fraudulent inducement or a mutual mistake, you can't do that. And we have uncontested verbal representations, uncontested written representations, and what they're doing is highly inappropriate. And so in an effort to justify what they've done here after the fact, they've come up with this argument about the parole evidence rule and the merger clause. Well, you can't, those don't even come into play unless and until you have an enforceable contract to begin with. They don't dispute the treatises that we signed on this point. It is a well-established point of Hornbook law that if there is no enforceable contract, the parole evidence rule doesn't come into play and neither does the merger clause. But they want to use those two doctrines effectively as an invisibility cloak to say, we can tell you whatever we want to tell you, no limit on what we tell you. As long as you sign, as long as there's a merger agreement, whatever we told you doesn't matter. And that just can't be right. There are different ways you can get to that outcome, but it just can't be right. Those agreements have to be unenforceable. With respect to the consideration point, this is a whole separate reason why both agreements fail. The case law in Illinois is well-established that in the restrictive covenant context, you have to have adequate consideration for it. And although continued employment can be adequate consideration, there's no Illinois case that's ever held that less than one year of continued employment is sufficient consideration. And the cases further say, including the Brown v. Brown case, which is from approximately 2004, and the Diedrich case, which is from 2011, both Illinois state cases, said it doesn't matter whether the individuals quit or whether they are fired. You still have to have continued employment generally for two years or more. So they don't even come close to that. So then the backstop argument that Gallagher has is this argument about access to confidential information. There's no Illinois case that either side has cited, because neither side is aware of where any court has ever held that mere access to confidential information can be sufficient consideration. Particularly so here, where Gallagher says they couldn't use the information for their personal purposes. So what benefit did it have to them? All they were doing their jobs, the same jobs they had before this asset purchase took place, they were doing the same job. What would be the other factors that Woodfield talks about? First of all, in Woodfield, I believe that was just dicta. I agree with that, but it still says that we shouldn't look at just a numeric formula. We should look at other factors. So what are some of the other factors? I don't recall exactly what the other factors were, Judge. It said that there is a possibility. I would concede that there could perhaps in certain circumstances be other factors that you look at. Well, one of them that I think Woodfield talked about was whether they resigned or were fired. I believe you're correct on that, Judge. I don't remember. I believe you're correct. But there are other cases that specifically say that that doesn't matter, including Brown and Brown and Diedrich. This may be a point where Brown, Diedrich, and Chow doesn't matter, conflict with the dicta in Woodfield, which suggested that it might matter. Would these acquisition of trade secrets be another factor that I realize other states have, and we're actually mostly a federal system, have adopted that as a potential factor of consideration? Is that something that we could, why shouldn't we consider that as another factor? In this particular case, there's no evidence that they did receive anything new. Although in a general rule, should we consider the acquisition of trade secrets as one of these other factors other than a numeric formula? I think in light of the Supreme Court's decision of reliable fire, I do think that there is room for looking at additional circumstances. I do think that that is what the Supreme Court has said. But applying those circumstances to this particular case, we have very extreme facts here. This is what has happened, and it's a gross injustice what was done to these individuals. And there's no evidence that they received any consideration. In fact, Mr. McKayla, although he never agreed to even their proposed modification, they let him continue to work there for another three months. So I don't believe that the restrictive covenants can be upheld, and I believe that if they fall, that the other counts all necessarily fall, even wholly apart from the pleading deficiencies. I think if the restrictive covenants fall, the other counts fall. And here's the reason why. On the trade secrets count, in order to have a trade secrets count, you have to have improper use, and you have to have some sort of improper acquisition. And so we pointed out in our briefs that they didn't allege anything indicating that they did anything improper to obtain these. All they were doing was doing their jobs. So Gallagher came back in his report. They have to say they stole them? They have to allege they did something improper. And Gallagher came back in his reply brief, and what it said is that the reason why they obtained them or did something improper was that they breached their post-employment contractual obligations, again, coming back to the employment agreement. So again, they're citing the employment agreements in order to justify or to try and The same thing is true with respect to the tortious interference with respect to the economic relations count. You're allowed to compete. You're allowed to compete for another business. Let me just take you back for a second. Is a restrictive covenant and a violation thereof necessary to a Trade Secrets Act complaint? No. No, it's not. Why couldn't this stand alone, then? Forget it.  I understand that's alleged in several of the paragraphs. But there are paragraphs that seem to parrot the language of PepsiCo and Teradyne that these people couldn't function in their new jobs without using this. And there are some, I mean, I think it's paragraphs 64 and 65, somewhere around there. And the complaints seem to parrot that inevitable disclosure type of complaint that would actually fly under those cases. A couple points. One, they do expressly disclaim reliance on the inevitable disclosure doctrine. Two, they throw out these conclusory assertions about the inevitable disclosure doctrine, but they don't actually point to any specific facts. The inevitable disclosure doctrine is a very, very narrow doctrine because it's potentially dangerous, because it potentially allows an employer to obtain a de facto non-compete in all kinds of circumstances, where here you've just got ordinary people doing their job, and they go to a competitor. And so when the courts have been willing to apply that, including in PepsiCo, it's been very narrow circumstances. PepsiCo was a bitter, bitter dispute involving rival companies, heated products, directly competitive products, and a senior executive who engaged in very dishonest conduct. As recently as earlier this year, courts have construed the inevitable disclosure doctrine and said we have to be very, very careful about it because the Trade Secrets Act involves a balancing, freedom of employee mobility, freedom to get another job, protection of In this case here, they don't allege any details about anything. And it's important procedurally to recognize that they never requested leave to amend. They never allege on appeal, and they've waived this argument by now, that the Trade Secret Act should have been dismissed without prejudice. They opted to stand on their pleadings. And their pleadings are very, very general. They just have boilerplate things. It's almost as if they pulled out the word processor and copied the same text for this case as for another case. They have to be. But if it worked in another case, why shouldn't they? Well, maybe it wasn't properly challenged in another case. But all that they did was parrot the sort of general standards. And under Illinois' fact pleading standards, they have to do more than that, particularly with the liberty and the ability to earn a living of individuals that's at stake. We're not talking about high-level corporate traders. We're not talking about people who are kind of the options exchange using one of these high-frequency trading programs. We're not talking about nuclear scientists. We're talking about claims adjusters. And this is their trade. Someone goes into McDonald's, they allegedly bite into a sandwich and break a tooth or something, and they bring a claim. They manage the claim from start to finish. But this is not a cutting-edge area of commerce or science. And it would be a gross injustice if they were allowed to either backdoor or non-compete and infringe on their liberty, which is what they're trying to do here. With respect to the tortious interference count, tortious interference with respect to economic relations, it's critical to emphasize that this was just ordinary competition. You're allowed to compete. The only way you can have a claim for tortious interference with respect to economic relations is if there's some sort of unjustified, wrongful competition. And here again, and they make this clear for the first time in their reply brief on appeal, the alleged wrongfulness, again, ties back to their employment agreements. That's where they say it's wrongful. They're saying it was wrongful solicitation. They wrongfully competed because they had these employment agreements that they contend barred them from doing that. Apart from that, if you actually parse the allegations, as Your Honors are required to do on appeal, they don't plead specific facts showing the elements of any of those claims. I'd be happy to answer any other questions any of Your Honors may have about any of these questions. If they were able to go forward as a result of this court's decision, what remedy would be available to them in light of the fact that we're looking at almost the passage of two years, which is the length of the agreement? I think there'd be no remedy because there's been no harm. That would go to the damages, but what about the injunctive relief? The injunctive relief, at a certain point, it would become moot. That's a good question. Thank you, Your Honors. When you're ready, Counsel. Let me ask the same question to you before you get on a roll. If we decided in your favor and this goes back to court, aren't we almost at the two-year level or the two-year running of the agreement? We are. So I think from the perspective of an injunctive remedy, there may be some questions there as to what's available. I know there is some case law in Illinois that injunctive relief can't be told based on certain language that's included in restrictive covenants. But at the same time, money damages are absolutely a viable remedy. We would be entitled to lost profits from the Gallagher Bassett customers that we believe were improperly in breach of their restrictive covenants taken, for lack of a better word, from Gallagher Bassett to you. But a trade secret act violation, one of the claims has to be that the items were misappropriated. Correct. How, let's just for a second play devil's advocate here and set aside the restrictive covenant. Let's say that restrictive covenant, we affirm the trial court and say that was not valid. How were they misappropriated other than that? If you look at what we allege in our complaint is the universe of Gallagher Bassett's confidential information. I think it's, as an aside, important to know that they never challenged at the trial court level that we had alleged that we had trade secrets. Their challenge was based on the misappropriation and mishandling. So part of what makes up Gallagher Bassett's universe of protectable trade secret information are customer histories of the way they've worked these insurance deals in the past, who they speak with when they work these deals, how they price their claims, that all of that is involved in the business that they do on a daily basis. What we allege that Mr. Bakala and Ms. Palanchich have done is taken all that information, all that Gallagher Bassett information, and used it when they got to York to, in a very short period of time, convert business of, convert fully the business of one Gallagher Bassett client and at least half of the business of a second Gallagher Bassett client to York, a process which, as we allege in our complaint, generally takes a significant amount of time. They did in a matter of weeks. These were clients who were GAB clients. They were GAB clients that were purchased by Gallagher Bassett. I understand that, but they also had a pre-existing relationship with these individuals who were working for GAB, I would imagine. That is correct. Okay, so, I mean, the fact that they moved quickly, when these people moved, maybe, you know, reasonable inference out of that is that they had a relationship with these individuals, so they moved their business. That is a reasonable inference, but you're drawing it on behalf of or in favor of the defendants. And at this stage of the proceeding, at the motion to dismiss stage, where we're looking at our allegations and interpreting in favor of Gallagher Bassett, that's not a proper inference for the trial court to have drawn. The trial court needs to look at the facts we've alleged, and counsel Farapolese throws around the phrase ordinary competition, but this wasn't ordinary competition. These are individuals who, trading on this information, this protectable information or information that we've alleged is protected and that they have not challenged, are using that information to flip these relationships from Gallagher Bassett to their new employee. Those are allegations that we made and that need to be interpreted in our favor and that should have survived the 2615 motion to dismiss. Getting back to the prole evidence argument, counsel read for you an email that Mr. McAuliffe himself sent where he said, is there any possibility of a compromise on this paragraph? And he's referring specifically to the non-compete clause. He continues, if the termination or change in position salary is by Gallagher Bassett, that this paragraph would be void. So he's not talking about some amorphous carve out where the old restriction doesn't apply. He's only saying, if you guys terminate my position, can we work something out on the non-compete provision? And that never happened. And again, all of the discussion surrounding whether or not there was, to use the term that counsel uses, fraud here. First of all, there is no fraud. If you look at our allegations, there's nothing in the allegations of the complaint from which you could pull out fraud, nor is there anything if the court were even to consider their declarations that would constitute fraud. And the cases that they cite in their brief all suggest situations where there's a big fraudulent scheme to get people to sign agreements that were part of a big amorphous fraudulent scheme. That didn't exist here. But again, these are fact questions. These are things that discovery is designed to understand. But there are a group in Ms. Polanyi's situation, there are a group of employees with questions. Those questions are voluntarily, I assume, being answered by Gallagher-Bassett. And one of the answers is, don't worry, this is really about solicitation. I mean, how much bigger does it have to get? We've got several employees with questions, asking questions. They're answered. Gallagher-Bassett can say, we're not talking to you. Sign in, or you're gone. They didn't say that. They voluntarily answered the questions. They did answer the questions. If you look at the language in the agreement, again, that they signed, it talks about who has the ability to modify or compromise certain terms of the agreement. And the people that Ms. Polanschich and Mr. Vakala were talking to were not those people. It's not the president of Gallagher-Bassett or the CEO, or sorry, the CFO, who are the two people specifically identified in the agreement that have the power to modify it. And again, they signed it. They could have said, I'm not going to sign this agreement until this alleged modification that I have negotiated is reflected in the body of the agreement. But they didn't do that. Well, I mean, if you're trying to prove whether there is an agreement or not, and I think we can use this information to prove whether there's an agreement, they were both told, don't worry. It either doesn't apply or we'll take care of it. And, okay, so why was Mr. Negril there? Because the president wasn't available? I believe simply because that's the person that Mr. Vakala reached out to when he was looking for a partner. It was someone at the, I thought the meeting was Ms. Polanschich, I'm sorry, at the other parties. I don't know why that individual was there, why she directed her questions to that individual. But again, I think those are issues that once you get past the pleading stage and get into discovery, that's the appropriate venue to answer them. Anything else? No, thank you. Thank you very much. Thank you.